UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------x
MADISON MASON and JANINE MASON,

                Plaintiffs,

       -against-                                    COMPLAINT

ETHICAL CULTURE FIELDSTON SCHOOL,        (Jury Trial Demanded)
JESSICA BAGBY, NIGEL FURLONGE,
and JOHN AND JANE DOES,

                Defendants.

---------------------------------------------------------------x

       Plaintiffs, Madison Mason and Janine Mason, by their undersigned attorneys, hereby allege as and for their Complaint as follows:

## PARTIES

       1.     Plaintiff Madison Mason ("Madison") is a person of color and a former student at Defendant Ethical Culture Fieldston School.

       2.     Plaintiff Janine Mason ("Mrs. Mason") is a person of color and the mother of Madison Mason.

       3.     Defendant Ethical Culture Fieldston School ("ECFS") is and was at all relevant times an exclusive and expensive private school located at 3901 Fieldston Road, Bronx, New York 10471.

       4.     Defendant Jessica Bagby was at all times relevant to this Complaint the Head of School at ECFS.

5.  Defendant Nigel Furlonge was at all times relevant to this Complaint the Principal of the high school, known as the Upper School, at ECFS.

6.  Defendants John and Jane Does are individual employees or agents affiliated with ECFS whose identities are at this time unknown and will be added as Defendants at a later date.

## JURISDICTION AND VENUE

7.  This action arises from 42 U.S.C. § 1981 as well as New York State and New York City laws, all of which prohibit racial discrimination and retaliation on the basis of race and color.

8.  Venue is proper in this District because the events relevant to this Complaint and the claims arose in this District.

## STATEMENT OF FACTS

9.  Madison enrolled as a student at ECFS in September of 2015 and graduated in August of 2020.

10. Madison is an academically gifted student, who competed for and received scholarships from ECFS, but as set forth below, was not provided with the same opportunities and benefits that were provided to white students and was in fact discriminated against because of her race and color.

11. ECFS did not provide Madison the same opportunities and support afforded white students; instead, it caused irreparable damage to Madison through an

2

unchecked virulent racist environment.

12. As a student of color at ECFS, Madison and Mrs. Mason were exposed to false, pervasive, and racially-biased stereotypical attitudes held by white students, their parents, and the ECFS faculty, staff and administrative employees, including the individual defendants in this action, that students of color, such as Madison, were unfairly receiving financial scholarships and not paying the full or fair cost of tuition; that students of color were poor; that students of color were admitted to the school based merely on their color and that they lacked the academic abilities of white students; and that, as such, the students of color were not entitled to or deserving of equal or fair treatment at the school or by the school.

13. Notwithstanding these racially biased attitudes, as persons of color, Madison and Mrs. Mason are entitled to enjoy all the benefits, privileges, terms and conditions of the contractual relationship as enjoyed by white persons.

14. As set forth in more detail below, throughout the time of her enrollment at ECFS, Madison and her mother, Mrs. Mason, were denied those rights and were subjected to pervasive racism at ECFS.

15. ECFS holds itself out to the public as an elite school that puts its students on track to be admitted to top colleges and universities in the United States, particularly Ivy League and other top schools in the country.

16. Although ECFS holds itself out to the public as a liberal, inclusive and

racially diverse school, in fact it is an elitist school run by predominantly white individuals who purposefully and intentionally discriminate against persons of color and maintain negative stereotypical attitudes about students of color.

17. As an institution and by means of the practices and policies set forth below, ECFS purposefully and intentionally discriminates against persons of color, including Madison and Mrs. Mason, and purposefully and intentionally retaliates against persons of color, including Madison and Mrs. Mason, who complained about racism at the school

18. As an institution and by means of its practices and policies, ECFS is intentionally and deliberately indifferent to the racially toxic environment that existed and persists at the school.

19. During the time of her enrollment at ECFS, Madison witnessed, or became aware of numerous racist incidents, where white students used the n-word when addressing or referring to black or brown students at the school or otherwise acted in a racially hostile matter toward students of color at the school.

20. For example, in the fall of 2016, in the presence of Madison and others, a white student called a black student a "nigger" in the middle of a mathematics class using that particularly offensive slur in a voice loud enough for all in the class to hear the comment.

21. Although the use of the slur violated the school's Code of Conduct, the

teacher, Stuart Quart, did nothing whatsoever to address the matter, and it became common knowledge with the students of color that racially offensive conduct would not be addressed or punished.

22. Upon information and belief, the school had at the time and continues to have a practice and *de facto* policy of not properly disciplining white students for racist conduct.

23. Upon information and belief, the disciplining of a white student for making a racist comment or otherwise acting in a racially discriminatory manner toward a student of color should lead to a form of school-initiated disciplinary action that would in the ordinary course, if substantiated, be reported to any college or other school for which the student later sought admittance.

24. Rather than disciplining students for racist acts, ECFS purposefully and knowing refused to take proper action, and as a result, ECFS knowingly created a racially hostile environment at the school and knowingly permitted that environment to persist throughout the time that Madison attended ECFS.

25. ECFS also purposely and intentionally refused to conduct proper investigations into racism at the school. For example, in 2016, as a "senior prank" a group of white students brought into the school several dozen large watermelons and littered the entire office of a black mid-level administrator at the school with the watermelons.

26. Although the black administrator was shocked and deeply hurt by this blatantly racist affront and although word of the offense became widely known throughout the school, ECFS intentionally and knowingly refused to conduct any kind of investigation because it did not want to punish or discipline its white students for their racist stunt.

27. Not surprisingly, racism persisted at the school in ways that directly and indirectly traumatized Madison and other students of color.  For example, while in dance class, Madison was often subjected to racist comments by school employees about her hair, which she maintained in a neat and curled Afro-style.

28.  Repeated comments during dance class that her hair "looked messy," —which was code for "ethnic" or "bad"—were deeply hurtful to Madison, and as a result, Madison at one point had her hair straightened to try and fit in and look less "ethnic" or different.

29. As a result of being shamed for her race and color, Madison was made to feel that she did not belong and suffered a loss of self-esteem and self-confidence.

30. Since ECFS failed to take steps to correct racism in any of its many forms at the school, racism continued to persist, fester, and spread at the school.

31. The systemic nature of the school's racism is revealed by the way ECFS evaluated the academic performance of students of color.

32. At times relevant to this Complaint, about 20 percent of the high school

consists of students of color and about 80% of the students are white.

33. Throughout high school (and the lower schools), ECFS maintained four different levels for the study of mathematics, and the school determined the placement of each student, including Madison, in one of the four levels of mathematics, based purportedly on the student's ability in mathematics.

34. In the ordinary course and in the absence of discrimination, the distribution of students in the various levels of mathematics should be reflective of the entire population of students for each grade.

35. At ECFS, however, about 60% of the students in the lowest level of mathematics were students of color, which represented a significant statistical departure from the standard deviation that would be otherwise expected from an objective and unbiased evaluation of each student's abilities.

36. As a result of the school's racist attitudes and racial stereotyping of students of color, Madison and other students of color were improperly placed at the lower level of mathematics than their abilities justified.

37. As a result of her lower placement in mathematics throughout high school, Madison was denied important academic benefits and opportunities that were afforded to white students.

38. For example, the opportunity to demonstrate a high aptitude in mathematics is an important factor in how well a student does in being accepted into

a top-level college or university, and by being kept in the lowest level of mathematics, Madison was denied this opportunity.

39. As another direct example of racism experienced at ECFS by Madison and Mrs. Mason, in the fall of 2017, Madison's Spanish teacher, Maura Furfey, falsely accused Madison of "cheating" and threatened to press charges against Madison with the academic integrity board.

40. According to the teacher, Madison had to have been cheating because the teacher assumed that Madison would not have been able to provide a particular answer to a particular question for an in-classroom Spanish test.

41. Only after Madison and Mrs. Mason were able to explain to the teacher that Madison was fluent in Spanish did the teacher withdraw the accusation and admit she had simply assumed that Madison was cheating, a conclusion driven by racial stereotyping.

42. The use of social media provided another means whereby racism was permitted to persist at ECFS. For example, in the spring of 2018, the entire school, including Madison and her family, was exposed to a widely disseminated video of two white seniors singing a song in which they repeatedly used the n-word.

43. As with the other examples of racism, ECFS, Bagby, and Furlonge refused to take disciplinary action against the two students, failed to charge them with violations of the Code of Conduct, and permitted them to graduate from the

school later that same semester without having any notation in their school records that these two students had violated the Code of Conduct or acted in a racist manner.

44. Later the same year, in November of 2018, several white male high school students at ECFS participated in a widely known "pledge" within their group not to masturbate during the entire month of November.

45. In order to "encourage" members of this particular group to maintain their "pledge" it became common knowledge at ECFS through social media and other means that the members of this group would look at photographs of the teenage girls of color at the school in order to "assist" them in maintaining their "pledge."

46. Knowledge of the "pledge," which was known as "No Nut November," spread throughout the school, and once again ECFS, Bagby, and Furlonge purposefully and deliberately failed to take any disciplinary action against these male white students for their blatantly racist and deeply hurtful and abusive conduct.

47. Later that same academic school year, in February of 2019, another white ECFS student posted an on-line video that was widely disseminated throughout the school.

48. In the February 2019 video, the white student referred to a male black student at ECFS as a "nigger," and in unison with two other white ECFS students, called the same black student a "crack nigger."

49. Again, nothing was done by ECFS, Bagby, and Furlonge to discipline these three students for violating the Code of Conduct or otherwise engaging in blatantly racist conduct.

50. In response to the ongoing and pervasive racist environment at ECFS, the next month, in March of 2019, over 50 students of color, including Madison, as well as many supportive white students at ECFS, occupied one of the buildings at the school and conducted a three-day and three-night sit-in to protest the ongoing racism at the school.

51. During the course of the sit-in, Defendant Bagby admitted that the school was responsible for the racially toxic environment at ECFS. Bagby stated that:

> "The current situation rises out of *multi-year racial trauma* our students have experienced while *at our school*. My colleagues and I could not be more profoundly sorry for this reality, which we fully recognize has weighed on the minds, hearts, and spirits of our students of color and their families *for years*." (emphasis added).

52. As a result of the March 2019 sit-in demonstration and as a result of the systemic and blatant racism at the school, numerous students of color and their parents, including Madison and Mrs. Mason, began speaking out or began speaking out more loudly about the racially hostile environment at ECFS.

53. Rather than take the required steps to address the issue, the school instituted a formal policy of retaliating against any student or parent who

complained about discriminatory treatment at the school.

54. As of about January 2020, the school formalized a policy and practice that, no matter what the circumstances, in the event that a student or parent complained about discrimination, then investigatory agents at the school were required: (1) to establish a "defensible position" regardless of the circumstances; and (2) to conduct an invasive and needless investigation about the complaining student's background in order to tarnish the victim as a wrongdoer, regardless of the facts or the merits of the circumstances, and thereby discourage further complaints of discrimination.

55. The racism and racially hostile environment continued into Madison's senior year at ECFS. For example, in the spring of 2020, Madison was racially profiled as doing "something wrong" when she was found by two ECFS teachers, Jessica Lassman and Carly Miller, in the bathroom with other female students comforting another female student of color who was upset. The teachers ordered Madison and the other girls to leave the bathroom because their conduct "looked suspicious."

56. Soon after being ordered out of the bathroom, an administrator at the school, Rashad Randolph, confronted Madison and harshly interrogated her as if she had done something wrong.

57. Randolph also ordered Madison to write a statement about the "incident"

even though there was no "incident."

58. The event in the bathroom only became an "incident" because the school staff simply assumed based on racial stereotyping that the students of color must be doing "something wrong" whereas white students at the school who engaged in comparable or similar conduct, such as talking in the bathroom, were not treated harshly, reprimanded, or ordered to write a statement about a non-existent "incident."

59. ECFS even treated Madison far more harshly than white students in the way that she was treated at school in terms of providing opportunities or additional time in which to complete assignments or make up an assignment or a missed task.

60. Finally, ECFS discriminated against and retaliated against Madison and Mrs. Mason for speaking out against racism by threatening to hold back Madison's graduation diploma based on false and pretextual grounds about Madison purportedly not having satisfied certain academic requirements, requirements that would not have created an issue for a similarly-situated white student in comparable circumstances.

61. As a result of the Defendants' conduct, Madison and Mrs. Mason have suffered severe emotional trauma, and Madison has suffered from depression, anxiety, an eating disorder, and a loss of self-confidence and self-esteem.

62. Defendants ECFS, Bagby, and Furlonge have acted maliciously and

knowingly in violating the Plaintiffs' rights and are liable to the Plaintiffs for punitive damages as well as compensatory damages.

63. Plaintiffs demand a jury trial on all issues to be properly tried to a jury.

## FIRST CLAIM FOR RELIEF
(42 U. S. C. § 1981 Discrimination and Retaliation)

64. Plaintiffs repeat the foregoing allegations as if set forth herein at length.

65. Defendants, acting on the basis of racial discrimination, have denied the Plaintiffs the full and equal benefits of all law, proceedings, and contractual relations for the security of persons and property as are enjoyed by white persons, in violation of 42 U. S. C. § 1981.

66. Defendants have denied the Plaintiffs the equal terms and conditions of the contractual relationship in connection with the Plaintiffs' enrollment at ECFS as those terms and conditions are enjoyed by white persons.

67. As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages in an amount to be established at trial.

## SECOND CLAIM FOR RELIEF
(New York Executive Law Discrimination, Retaliation, and Aiding and Abetting)

68. Plaintiffs repeat the foregoing allegations as if set forth herein at length.

69. Defendants have violated New York Executive Law § 296 *et seq.,* by discriminating against the Plaintiffs on the basis of their race and have specifically violated New York Executive Law § 296(4) by permitting and aiding and abetting harassment at ECFS against the Plaintiffs because of their race and color.

70. Defendants have violated New York Executive Law § 296 *et seq.,* and § 296(7) by retaliating against the Plaintiffs for opposing the Defendants' unlawful practices and by taking actions against them that were designed to inhibit or punish the Plaintiffs from exercising their rights.

71. As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages and in an amount to be established at trial.

72. Defendants Bagby and Furlonge and Defendants John and Jane Does knowingly and actively participated in and aided and abetted the unlawful practices, discrimination and retaliation against the Plaintiff in violation of the New York Executive Law.

### THIRD CLAIM FOR RELIEF
(New York City Administrative Code Discrimination, Retaliation, and Aiding and Abetting)

73. Plaintiffs repeat the foregoing allegations as if set forth herein at length.

74. Defendants have discriminated against the Plaintiffs as providers of a public accommodation; have retaliated against Plaintiffs on account of their race and color and for engaging in protected conduct; and have interfered with their protected rights, in violation of New York City Administrative Code § 8-107(4), § 8-107(7), § 8-107(19) and § 8-107 *et seq.*

75. Pursuant to NYC Adm. Code §8-502(c), the Plaintiffs will serve a copy of this Complaint to the NYC Commission on Human Rights and the NYC Law Department.

76. As a direct and proximate result of the Defendants' unlawful actions, the Plaintiffs have suffered damages, including monetary loss and mental anguish, emotional distress, embarrassment, stress, anxiety, and loss of self-esteem, for which they are entitled to an award of money damages in an amount to be established at trial.

77. Defendants Bagby and Furlonge and Defendants John and Jane Does knowingly and actively participated in and aided and abetted ECFS's unlawful practices, discrimination, and retaliation against the Plaintiffs in violation of New York City Administrative Code § 8-107(6).

WHEREFORE, the Plaintiffs demand the following relief jointly and severally against all Defendants:

(a) a declaration that each one of the Defendants violated the Plaintiffs' federal rights as well as their rights under the laws of the City of New York and the

State of New York;

  (b) compensatory damages for emotional and reputational injuries suffered by the Plaintiffs by reason of each Defendant's unlawful and unjustified conduct, in a just and reasonable amount in conformity with the evidence at trial;

  (c) punitive damages against each Defendant to the extent allowable by law;

  (d) reasonable attorneys' fees pursuant to 42 U. S. C. §§ 1988, N.Y. Executive Law § 297, and the New York City Administrative Code, Section 8-502(f);

  (e) costs and disbursements of this action; and

  (f) such further relief as appears to the Court to be just and proper.

## JURY DEMAND

Plaintiffs demands a jury trial on all issues so triable.

Dated: New York, New York
      February 20, 2023

By: *s/Nathaniel B. Smith*

_____

Nathaniel B. Smith
225 Broadway – Suite 1901
New York, New York 10005
(212) 227-7062
natbsmith@gmail.com

John D. Lenoir
4603 Parkwood Road
Austin, Texas
(212) 335-0250
john.lenoir@lenoir- attorney.com